### E. L. BOGUE v. TEXAS TRACTION COMPANY.

No. 2345.   Decided February 17, June 26, 1915.

**1.—Contributory Negligence—Question of Law.**

Evidence considered in case of a motorman operating a street car and in-
jured by collision with a car ahead and going in the same direction, is held to
show contributory negligence and disregard of the rules prescribed for him in
such operation so unquestionably as to be deemed matter of law, and to justify
the appellate court, on reversing a judgment recovered by him, in rendering same
against him.   (Pp. 282-290.)

ON MOTION FOR REHEARING.

**2.—Same—Violation of Rules.**

The opinion in this case is explained as not announcing that violation of
the rules laid down by an employer, if causing injury to the servant violating

them, always and necessarily constitutes negligence in law; but only that such negligence was conclusively shown by the evidence here considered. (Pp. 289-291.)

Error to the Court of Civil Appeals for the Fifth District, in an appeal from Dallas County.

Bogue sued the Texas Traction Company and recovered judgment. On defendant's appeal this was reversed and judgment rendered in its favor, and Bogue obtained writ of error.

*Barry Miller, Ed Sewell, Carden, Starling, Carden, Hemphill & Wallace* and *C. L. Black* and *S. D. Ramsey,* for plaintiff in error.—The court erred in holding that the evidence shows conclusively that appellee was guilty of contributory negligence, and that the trial court erred in not instructing a verdict for the appellant. S. A. & A. P. Ry. Co. v. Way, 9 Texas Civ. App., 214, 29 S. W., 207; G. H. & S. A. Ry. Co. v. Adams, 94 Texas, 100; Smithson v. Chicago G. W. Ry. Co. 71 Minn., 216.

In rules of the class under consideration, to-wit: those violated by a trainman, following another train where the second train collided with the rear of the first, it is a question of fact for the jury whether the violation thereof is contributory negligence. T. & N. O. Ry. Co. v. Mortensen, 27 Texas Civ. App., 106, 66 S. W., 99; S. A. & A. P. Ry. Co. v. Connell, 27 Texas Civ. App., 553, 66 S. W., 246; M. K. & T. Ry. Co. v. Mayfield, 29 Texas Civ. App., 477, 68 S. W., 808; Maehren v. Great Northern Ry. Co. (Minn.), 107 N. W., 951; G. H. & S. A. Ry. Co. v. Adams, 94 Texas, 100; M. K. & T. Ry. Co. v. Parrott, 43 Texas Civ. App., 325, 96 S. W., 950; So. Pac. Ry. Co. v. Allen, 48 Texas Civ. App., 66, 106 S. W., 447; G. H. & S. A. Ry. Co. v. Cherry, 44 Texas Civ. App., 344, 98 S. W., 898; G. H. & S. A. Ry. Co. v Still, 45 Texas Civ. App. 169, 100 S. W., 179; Railway Co. v. Jones, 75 S. W., 53; Railway Co. v. Thompson, 41 Texas Civ. App., 459, 93 S. W., 702; M. K. & T. Ry. Co. v. Pawkett, 28 Texas Civ. App., 583, 68 S. W., 323; Railway Co. v. Follin, 29 Texas Civ. App., 512, 68 S. W., 810; Railway Co. v. Cornell, 29 Texas Civ. App., 496, 69 S. W., 980.

The violation of a rule, which requires of a motorman that his car must be under absolute control so that instant stop is possible, and which provides that cars must be under control crossing intersecting streets, is not contributory negligence per se, but it is a question of fact for the jury whether or not he is guilty of contributory negligence in violating such rule. Maehren v. Great Northern Ry. Co., 107 N. W., 951; Lake Shore & M. S. Ry. Co. v. Parker, 131 Ill., 557, 23 N. E., 237; Hall v. C. B. & N. Ry. Co., 46 Minn., 439, 49 N. W., 239; So. Ry. Co. v. Craig, 51 C. C. A., 63; G. C. & S. F. Ry. Co. v. Boyce, 39 Texas Civ. App., 195, 87 S. W., 396; S. A. & A. P. Ry. Co. v. Connell, 27 Texas Civ. App., 533, 66 S. W., 246.

[ON MOTION FOR REHEARING, WHICH WAS REFUSED.]

That the mere violation of a rule of an employer by an employe is not negligence per se is held in so many cases that even a partial citation of them may seem an imposition. We content ourselves with an enumeration of those cited by Mr. LaBatt in his work on Master and Servant (2d ed.), volume 3, page 3607: Galveston, H. & S. A. R. Co. v. Sweeney, 14 Tex. Civ. App., 216, 36 S. W., 800; St. Louis Southwestern R. Co. v. Hysen, 101 Texas, 543, 109 S. W., 929; Texas & N. O. R. Co. v. Mortensen, 27 Texas Civ. App., 106, 66 S. W., 99; San Antonio & A. P. R. Co. v. Connell, 27 Texas Civ. App., 533, 66 S. W., 246; Missouri, K. & T. R. Co. v. Pawkett, 28 Texas Civ. App., 583, 68 S. W., 323; Missouri, K. & T. R. Co. v. Mayfield, 29 Texas Civ. App., 477, 68 S. W., 807; Gulf, C. & S. F. R. Co. v. Cornell, 29 Texas Civ. App., 496, 69 S. W., 980; Missouri, K. & T. R. Co. v. Bodie, 32 Texas Civ. App., 246, 74 S. W., 357; Texas C. R. Co. v. Bender, 32 Texas Civ. App., 568, 75 S. W., 561; Gulf, C. & S. F. R. Co. v. Boyce, 39 Texas Civ. App., 195, 87 S. W., 395; Missouri, K. & T. R. Co. v. Parrott, 43 Texas Civ. App., 327, 94 S. W., 1135, 96 S. W., 950; Texas & N. O. Ry. Co. v. Conway, 44 Texas Civ. App., 68, 98 S. W., 1070; Galveston, H. & S. A. R. Co. v. Cherry, 44 Texas Civ. App., 344, 98 S. W., 898; Galveston, H. & S. A. R. Co. v. Still, 45 Texas Civ. App., 169, 100 S. W., 176; Southern P. R. Co. v. Allen, 48 Texas Civ. App., 66, 106 S. W., 441; Texas & N. O. R. Co. v. Jackson, 51 Texas Civ. App., 646, 113 S. W., 628; Missouri, K. & T. R. C. v. Jones, 75 S. W., 53; Worcester v. Galveston, H. & S. A. R. Co., 91 S. W., 339; Texas & P. R. Co. v. Cotts, 95 S. W., 602; El Paso & S. W. R. Co. v. Alexander, 117 S. W., 927; Houston & T. C. R. Co. v. Ravanelli, 123 S. W., 208; Missouri, K. & T. R. Co. v. Richardson, 125 S. W., 623; Fraser-Johnson Brick Co. v. Baird, 128 S. W., 460.

*Templeton, Beall & Williams,* for defendant in error.

MR. CHIEF JUSTICE BROWN delivered the opinion of the court.

We copy from the opinion of the Court of Civil Appeals the following statement with reference to the case:

"This is a suit by appellee to recover of the Texas Traction Company damages for personal injuries received by him by reason of the car operated by him on the Metropolitan Street Railway running into the rear end of a car operated by the Traction Company on the said street railway track.

"Appellant pleaded the general issue, assumed risk and contributory negligence.

"A trial resulted in a verdict and judgment for appellee and appellant prosecutes this appeal.

"The first assignment of error complains of the court for refusing to submit to the jury a special instruction as follows: 'You are instructed in this case to return a verdict for the Texas Traction Company.'

"The facts show that Bogue was an employe of the Metropolitan Street

Railway Company in the City of Dallas, and at the time of the accident was operating one of its cars as motorman. The Texas Traction Company operated an interurban line from Dallas to Sherman, and in the City of Dallas its cars run over the track of the Metropolitan Street Railway Company. The street railway company has double tracks extending north and south (general direction) across East Dallas along Peak Street, a distance of probably a mile or more. These tracks cross at right angles streets of the city, a distance from one another of 300 to 400 feet, at which crossings arc lights are swung by the city in the usual way; the city cars are called North Belt cars and go the full length of Peak Street, crossing Bryan; the interurban cars leaving the city pass out over Peak Street to Bryan, then turn at right angles going into Bryan Street and in a northeast direction out of the city; the incoming cars enter the city over the same line.

"The accident occurred at 11:45 o'clock at night; the incoming interurban car turned out of Bryan Street into Peak Street ahead of the city car; as the turn was made the city car was some four or five hundred feet north on Peak Street. Bogue, the motorman, saw the interurban as it swung around the corner at Bryan and passed over the switch to the right-hand track, coming in; by that time Bogue had approached still nearer the car; he could see the interurban because its side was turned towards him and the inside was brilliantly lighted with electric lights. Bogue discovered at that time that there were no lights upon the rear end of the interurban car. The collision occurred at Swiss Avenue crossing, being the second crossing south of Bryan. The surface is level from Bryan to Swiss, rising just a little. The incoming interurban had stopped on the south side of Swiss Avenue about the same time the outgoing interurban came up along side of the incoming car and stopped, or almost stopped. At this time the city car approached Swiss Avenue from the north.

"Appellee testified: 'There were no red lights on the rear end of the incoming interurban car; I discovered that just after I hit it, and before he taken the cross over on Bryan Street I did not see any red lights on the rear end of it. The first time I discovered there were no red lights on it was after it had turned into Peak Street. After it passed I did not think very much about it. I knew it would pull right off and leave me like they always do. I did not think anything about running behind a car that had no red lights on it. I was not dreaming of any such thing as running behind that car; did not know anything about it, never had thought of it. I was not expecting to run into it. When I first saw it I never thought much about it, only I thought it did not have any markers on the back of the car. I have seen them several times since. I don't know that I ever noticed it before. I know that at that time they did not often carry them, but did not know it at that time. I also knew that a bright light was shining in my face; I think that if you were going south and following another car going south and there is a car on the other track going north, there

would be a time when the car in front going south would prevent you from seeing the car going north on the other track. I was running something like six or seven miles an hour when I got to the north edge of Swiss Avenue and the southbound interurban car something like six or seven feet, something like that, below Swiss Avenue. The northbound interurban car was just sticking over a little bit into Swiss Avenue, or about even with Swiss Avenue or something like that. When I came up to Swiss Avenue and going into Swiss Avenue I think I was going about six or seven miles an hour; when I got to the south edge of, Swiss Avenue I was making about three miles an hour; not over three miles an hour. I had to pass the headlight of the northbound Texas Traction Company car before I saw the southbound Texas Traction Company car, which would put me around about the south side of Swiss Avenue when I discovered the southbound Texas Traction Company car. The reason I did not see it sooner is because the headlight on the northbound Traction Company car was so bright it blinded me and I could not see it. The headlight of the northbound Texas Traction Company car, which was on the opposite track from the track I was on was so bright it blinded me. That headlight was very bright, in full blast. They usually use a screen of white cloth over the headlight to make it dim. They do that to screen the headlight so it would not burn so bright; it is to blind it. I have seen those screens of cloth used on this Fort Worth interurban—the Northern Texas Traction Company—and then they have used that on these Sherman interurbans since. The Texas Traction Company have used them since. I had the accident. They either used the screen, or when they come out Peak Street here they cut their lights out very nearly. . . . There is a rule in the Rule Book of the Dallas Street Railway Company about the speed of cars passing cars that are standing still. . . . The rule is that when one car is standing still and you are approaching with another car, the speed is three miles an hour, and over switches the same way. You are supposed to go over switches at three miles an hour, when an inspector is around. I don't know how fast a motorman ought to run; I did not know when I was in the service. All I cared was to make the schedule time that was given. I was due at the loop on Market Street that night at 12:00 o'clock; I had only 15 minutes to run from Bryan Street to town. I don't know how far that is, but suppose it is over two miles. The rule in regard to spacing between cars while in motion is 300 feet, and at rest, 25 feet. . . . When the interurban car turned off of Bryan Street into Peak Street I guess I was about three blocks north of it, something like that; I suppose it would be about 600 feet. That would throw the north side of the interurban car towards me as it took the crossing off of Bryan into Peak Street. While operating a street car the motorman is supposed to stand in the center of the car in the front end, in order to operate both his brake and controller. They are located right there; one on one side and the other on the other side. The rule respecting attention and observation in respect to the track

in front is to look ahead of you continually while the car is in motion. I understood that at the time. I saw the interurban car ahead turn in on Bryan and Peak Street. . . . When I pulled out from Bryan Street south I don't know how far ahead of me the interurban car was. . . . I know about the time I got to Swiss Avenue that the northbound interurban car was standing still. I saw the light before that but you can't tell whether they are moving or not. I did not know it was standing until I got up to about the edge of Swiss Avenue, as well as I remember. My judgment is I was something like the north edge of Swiss Avenue when I discovered the northbound interurban car ahead stopped. It was on the south side, with the body of the car down Peak. . . . Having discovered it, it did not occur to me that it had stopped in order to let another car pass. I thought it had stopped there because about a month before this there was a Sherman interurban car hit a wagon there on Swiss Avenue; the first thing struck me was it was something like that. I never thought of this other car. . . . If it had not been for that thought about the wagon I would have stopped anyway, because after I saw the car had stopped I would have to roll on down just like I had to pass a car, just like I always pass a car standing still. I never thought about the fact that the motorman on the interurban car ahead of me would have to stop his car on account of that regulation and that he might be standing there in the dark. There were lights on the inside of the car ahead of me; there are lights in all cars. I saw them through the glass door. I saw the lights as the car passed Bryan Street at the crossing over there. . . . I would not swear that it is an electric light; I do not know a thing in the world about the headlight on one of these interurban cars. The lights on our cars are just like the lights here in the court room, 16 and 32 candle power. We had a light on the rear end of our car, but not a red light. It was not our order to have red lights on the rear of the car. I don't know that the city ordinances require that. . . . For stopping the car, my car was equipped with a hand brake and a reverse lever. The reverse lever is attached to the controller of the car at the front end and it has three notches on it; one locks the controller and the notch ahead feeds the controller when you put the juice, or current to it. The hand brake is used to stop the car. We do not use both the hand brake and the reverse to stop the car. The reverse lever is used only in emergencies. The stopping power comes from the brake operating against the wheel. When you jerk the reverse lever that turns the wheels in the opposite direction. To reverse a car you pull the lever and feed the controller; that is feed the current into the reverse machine of the car; you can use both hands and do that all at once.

" "The car was in good condition, except a little tight with the brakes kicking. A kicking brake is one that is not adjusted right and jerks a little. I was pretty well qualified to perform my duties and thought I understood what they were. I familiarized myself with the rules and regulations; had them furnished me by my superiors in the service

and studied them while I was breaking into the business. Of course, I understood that I was expected to obey the rules and regulations. I knew that in passing over Peak Street we passed the interurban cars now and then. There are two tracks out on Peak Street and all cars going north on the right-hand track. Peak Street is double tracked to where Washington Avenue car line runs. Going north the cars are on the right-hand side and coming south it is the same way. As the cars pass there is a space I guess of two or three inches between them. There is no rule about speed in regard to passing cars while they are in motion. There is a rule in the rule book of the Dallas Street Railway Company about the speed of cars passing cars that are standing still. I haven't the book with me. We are not allowed to keep it after we quit.

" 'The rule is that when one car is standing still and you are approaching with another car, the speed is three miles an hour, and over switches the same way. . . . I don't know of any rule of the interurban company that when one interurban meets another it had to come to a stop, and there is no reason that I know of for the northbound car to stop when it met the southbound. I never had any order to put any lights or signals on the rear end of my car. Our instructions are to keep our headlights cut out on the rear end of our cars. The interurban cars put signals on the back end of their cars because they are easily seen and that is why they used red lights instead of white lights. I don't know whether they had been running with red lights back there in the rear before I was hurt or not. When you are meeting one of these interurban cars with a bright headlight burning you are not able to tell whether the car is moving or not until you get pretty close to it.' Bogue made a signed written statement to his company within a few hours after the accident. He said: 'When I first saw the car I was only 15 or 20 feet away from it. It was standing and I was running about ten or twelve miles an hour when I first saw it. The Texas Traction cars had met there and had stoppel. The one going north had the headlight burning very bright and blinded me so I could not see the other one. There was no red light on the rear end of the southbound Sherman car. There were no lights of any kind. They were about a car length south on Swiss Avenue. When I first saw the Sherman car, I set up my brakes and reversed and blew the overhead. Then I ran into the Sherman car. The front end of my car was crushed in and the top of the controller was turned loose but never fell. I had my foot under the bottom of the controller and I think when the top was turned loose it fell back and caught my toe under the edge of it is what hurt my foot. I was knocked down, but fell down against the end of the car. I could see the headlight on the northbound car from the time I crossed Bryan Street until I struck the southbound car. I have had no orders about passing Sherman cars. I had several passengers on my car and none of them were hurt. I am not hurt anywhere except my foot. Dr. Doolittle saw my foot; he said there were no broken bones. My car was not in good condition, the brakes were bad. I had not reported

them. I had had the car since 5:30 p. m. I do not hardly know what was the matter with them, except that they were what we call a kicking brake. I do not know how they were at this particular time. I had to commence trying to stop a good piece back from where I wanted to stop on account of the condition of the brakes.'

"One of the printed rules of the street car company reads as follows: 'When passing cars that are at a standstill on opposite tracks, cars that are about to stop, or when passing cars in any part of the city where the street traffic is heavy, or pedestrians or vehicles are nearby, the car must be slowed down to a speed not exceeding three miles per hour, and must be under absolute control so that instant stop is possible.' Another rule: 'Cars must be under control crossing intersecting streets. Cars running in opposite directions must not cross intersecting streets, steam or electric railway tracks at the same time. The car reaching the street, steam or electric railway tracks first will have the right of way and the other car must wait until the first car has passed over.'

"The evidence was conflicting with reference to the interurban car having a light on its rear end at the time of the collision and it was sufficient to support the jury's finding that there was none. It also shows that appellee was injured by the collision. Plaintiff offered in evidence an ordinance under date 1877, of the City of Dallas, Chapter 4, entitled: 'Rules governing the operation of street railways; street railways subject to the conditions of this chapter.' It was provided that the rules and regulations concerning the running and operation of street railway cars shall be binding upon every person, firm or corporation operating a street railway within or leading into the city. Section 8: 'The cars after sunset shall be provided with signal lights.' It is shown that in 1908, Texas Traction Company owned and operated an interurban railway from Sherman to Dallas, having tracks, right of way, depots, etc., and running into the city over the lines of the city street railway by virtue of an ordinance of the city granting the right and permission to operate its cars over the track of certain railway companies, and that said ordinance was granted subject to the existing charter and ordinances of the City of Dallas and such future charter and ordinances as may be hereafter passed, etc. It was also shown by the city charter adopted in 1907, that interurban railways are therein defined to be, within the meaning of the charter, 'railways operating their cars by electricity for the carriage of freight and passengers for hire, not wholly within the city and its suburbs, but as lines extending from the City of Dallas and its suburbs to other towns, cities or villages.' 'That the Board of Commissioners shall have power, subject to the terms and conditions contained in this charter, to grant to a person or corporation desiring to extend an interurban railway into the city, the right to lay tracks and operate cars over the streets or other property of the city and over the tracks of other street railways for a term not exceeding twenty years.' Also, 'The right mentioned in the preceding section shall be granted by ordinance only, which shall not be finally passed until after

three separate readings, etc. . . . The ordinance granting such right or franchise shall contain such conditions as may seem proper to the Board of Commissioners, and shall provide for such reasonable compensation to the city as may seem just, etc.' It is then provided in the next section: 'The terms of this charter concerning the granting of franchises to persons or corporations for the purpose of rendering any public service wholly within the City of Dallas and its suburbs, shall not apply to interurban railways, except as specified in the four preceding sections and in the various sections providing for the referendum.' The city ordinance provided that: 'Cars driven in the same direction shall not approach each other within a distance of 300 feet, except in case of accident.' Ordinance also provided: 'It shall be unlawful for any person to propel, drive or move any street car at any place in the City of Dallas at a greater rate of speed than 12 miles per hour.' It is also provided by city ordinance that 12 consecutive hours shall be the limit to keep conductors, motormen, etc., on the cars. Also, a rule of the company, that, in passing cars at a standstill on opposite tracks, the speed in no event to exceed three miles per hour and must be under absolute control so that instant stop is possible; also, at street crossings make full stop on opposite side of street to let the car upon the opposite side, reaching it first, pass over, etc."

The Court of Civil Appeals should not have rendered the judgment in this case if the evidence is such that a jury might fairly arrive at the conclusion that the plaintiff was not guilty of contributory negligence by his act of running into the rear of the car of the Street Car Company. Stevens v. Masterson, 90 Texas, 417, 39 S. W., 292, 921; Warren v. Harrold, 92 Texas, 417, 49 S. W., 364.

This presents usually a difficult question for this court, for it calls upon the court to place itself in the attitude of the jury, to determine the weight of the evidence most favorable to the plaintiff, discarding all evidence to the contrary. If, therefore, fairly considering the evidence with a view of arriving at a just solution of the issue between the railway company and the plaintiff, the jury might have concluded that the plaintiff was not guilty of negligence which contributed to his injury, then we must reverse the judgment of the Court of Civil Appeals and remand the case for another trial.

In order to present this question, we will briefly state the points in the evidence of the plaintiff which tend to show the character of his act. In the first place, on the same track he had fallen in behind and followed for some distance, the car of the Interurban Company, into which he ran subsequently, and he saw that it had no light in the rear. There was no evidence that the interurban car was required to carry a light in the rear, but we will consider the question upon the assumption that it was the duty of that company to have provided rear lights for its cars under such circumstances. We will therefore assume that the motorman on the interurban car was guilty of negligence in failing to have a light on the rear of the car, with which the car, which the plain-

tiff was operating, collided. This reduces the question to, Was the plaintiff guilty of such negligence as contributed to his injury as should prevent him from recovering?

It appears from the opinion of the court that there was a rule of the street car company for which the plaintiff operated its car, that no car should run at a higher rate of speed than three miles an hour in crossing a street. There was also a rule that when a car was standing on the opposite side of a street which was being approached, the car approaching should not cross, but should stop and wait until the standing car had crossed over.

The plaintiff's evidence is to the effect that he was running at about twelve or thirteen miles per hour until he was within twenty feet of Swiss Avenue, and about three miles per hour when his car crossed the Avenue. When the collision occurred the front of his car was *crushed,* which would justify the conclusion that Bogue was mistaken as to the speed at which the car was moving when the collision occurred. When the car was running three miles per hour it could not produce such result. But he says he saw the northbound interurban car standing on the south side of Swiss Avenue, and the rule by which he should have been governed required that he should come to a stop, and remain until the interurban car had passed. Bogue disobeyed that rule, and proceeded to cross the street, whereby he was injured.

The disregard of the requirements of that rule of his company was negligence as a matter of law, and the Court of Civil Appeals correctly reversed the judgment of the trial court, and under the undisputed evidence properly rendered judgment for the street car company. It is therefore ordered that the judgment of the Court of Civil Appeals be and it is hereby affirmed, and that the defendant in error recover of Bogue all costs in all courts.

*Affirmed.*

Opinion delivered February 17, 1915.

### ON MOTION FOR REHEARING.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

It was not the purpose of the court to announce in the opinion rendered by the late Chief Justice Brown on the original hearing of the case, that the violation by an employe of a rule of the master for the government of the particular employment amounts, in itself, to negligence per se, as the counsel for the defendant in error seem to have understood; nor was it so stated in his opinion. It was only intended to declare,—and reading the statement of Judge Brown on the question in association with the rest of his opinion it is so revealed,—that under the state of the evidence and the circumstances shown by it the violation by Bogue of the rules referred to amounted to contributory negligence on his part as a matter of law, as held by the Honorable Court of Civil Appeals in its disposition of the case. We adhere to that view.

It is needless to say that a violation of such rule under certain circumstances may amount to negligence as a matter of law, as fully so as any other conduct; and that this court has the authority to so hold without in anywise invading the province of the jury. It simply proceeds from the duty as well as the authority of the court to declare the law under a given state of facts.

Bogue knew that the interurban car, into which he ran the car he was operating as a motorman, was proceeding just ahead of him on the same track in the same direction with his car, without, according to his testimony, any light on its rear end, because he saw it plainly. It was brilliantly lighted with electric lights on the inside. The collision occurred at the intersection of Swiss Avenue with Peak Street, along which the two cars were moving. An outgoing or northbound interurban car had approached Swiss Avenue from the south on a parallel track, and had stopped on its south side, with its headlight brilliantly burning. Bogue knew this when he approached Swiss Avenue from the north. Under rules of his own company which were binding upon him, it was required that under such conditions he stop his car on the north side of the Avenue so as to permit the outgoing interurban car, which had first reached it, and therefore had the right of way to cross it, to pass over it before attempting to cross the Avenue with his car; and that in passing a car at a standstill on an opposite track the speed should in no event exceed three miles an hour, and the car be under absolute control so as to make possible an instant stop. Bogue did not stop his car on the north side of Swiss Avenue so as to permit the outgoing interurban car to cross over. Neither was the speed of his car reduced to three miles an hour as it approached and entered upon Swiss Avenue; nor was it under absolute control. Instead, he kept right on across Swiss Avenue without stopping; and, according to his own testimony, entered Swiss Avenue at a speed of six or seven miles an hour,—at one place in his testimony it is stated as ten or twelve miles an hour, and crashed into the rear of the interurban car ahead of him, which had stopped on the south side of the Avenue and which he must have known was just in front of him. He says he did not see the car just in front of him at the immediate time because the brilliance of the headlight of the outgoing interurban car, then standing on the south side of Swiss Avenue, blinded him. He knew, however, that that light was shining in his face, and, if it did blind him, that it interfered with his vision; and with his knowledge that the other car was in front of him, that condition made it all the more necessary, as an act of ordinary caution, that he observe for his own safety both the rule requiring him to stop his car on the north side of Swiss Avenue, and to reduce its speed so as to put it in under absolute control, in any event.

It is the practice of this court to defer to the finding of a jury where the facts are in issue. But if under the circumstances shown in this case it may be held that Bogue, in disregard of rules framed for his own protection under such a condition as was presented at the time of this

collision, could plunge ahead with his car and take the risk of its smashing into the rear of a car which he knew was just ahead of him, and then be relieved of the consequence of his act, it might as well be announced in the same connection that in this jurisdiction the law of contributory negligence no longer has any force.

The motion for rehearing has been carefully considered, and is overruled.

Opinion delivered June 26, 1915.